IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Robert A. Newbill,               )
                                 )
          Plaintiff,             )
                                 )
v.                               )      CIVIL ACTION NO. 1:10cv41
                                 )
United States of America,        )
                                 )
          Defendant.             )

## AMENDED MEMORANDUM OPINION

THIS MATTER is before the Court on the Parties' Motions for
Summary Judgment. (Dkt. Nos. 15 & 30.) This case concerns the
Plaintiff's liability regarding the failed payment of income,
social security, and Medicare taxes ("trust fund taxes") from
employee wages to the Internal Revenue Service ("IRS").

There are two issues before this Court. The first issue is
whether Plaintiff was a responsible party pursuant to 26 U.S.C.
§ 6672 (2006) when he was president and majority shareholder of
the company that failed to make the trust fund tax payments.
The second issue is whether Plaintiff willfully disregarded his
duty to pay trust fund taxes pursuant to § 6672 when he (1)
preferred payment to non-government creditors, and (2) learned
of the tax deficiency three weeks after the deficiency occurred.

The Court GRANTS Defendant's motion for summary judgment.
The Court holds that Plaintiff is liable for the trust fund

taxes because the totality of the circumstances establish that he was a responsible party pursuant to § 6672. The Court further holds that Plaintiff was willful in his nonpayment of trust fund taxes because he intentionally preferred non-government creditors, which establishes willfulness as a matter of law. Each issue is addressed in turn below.

## I. BACKGROUND

This case concerns the Plaintiff's liability for failed trust fund tax payments. Federal law requires employers to withhold income, social security, and Medicare taxes from employee wages and remit those taxes to the United States. These taxes are commonly referred to as "trust fund taxes," as the employer must hold them in trust for the benefit of the United States.

In November and December 2003, the IRS assessed Plaintiff personally for failure to pay withholding trust fund taxes on five employee payrolls. Plaintiff paid the IRS $99,566.43 for these five payroll periods.

Plaintiff was president and majority shareholder of New Construction, Inc. ("NCI"), a construction company with, for the period relevant here, over 300 employees and annual revenues of

2

around $40,000,000.  (Plaintiff's Facts[1] ¶ 1.)  In his capacity
as president of NCI, Plaintiff had broad authority over NCI
operations: he had signature authority on NCI's bank accounts
(Plaintiff's Facts ¶¶ 16, 28; Plaintiff's Ex. 29.),[2] he
controlled the wages and salaries of NCI's employees (Hratch
Dep. 17:7-18.), and he decided which of NCI's creditors would be
paid. (Id. 27:11-18.)  Additionally, NCI's controller provided
to Plaintiff every morning a summary of NCI's cash positions,
accounts payable, and accounts receivable.  (Id. 27:11-18.)  In
the "Report of Interview with Individual Relative to Trust Fund
Recovery Penalty or Personal Liability for Excise Tax," dated
July 1, 2004, Plaintiff described his responsibilities:
"everything."  (Plaintiff's Ex. 49.)

Kevork "George" Hratch ("Hratch") was NCI's controller.
(Plaintiff's Facts at ¶ 6.)  In his capacity as controller,
Hratch handled the mechanics of making trust fund tax payments
with the IRS.  (Hratch Dep. 13:15-22.)  Hratch used the IRS's
Electronic Federal Tax Payment System ("EFTPS") to pay
withholding taxes.  (Plaintiff's Facts ¶ 7.)  The IRS required
use of the EFTPS to pay trust fund taxes; failure to pay

---

[1] References to Plaintiff's Statement of Undisputed Facts,
Plaintiff's Motion for Summary Judgment at pp. 2-14 are referred
to as "Plaintiff's Facts ¶"
[2] Plaintiff's summary judgment exhibits will be referred to as
"Plaintiff Ex." and Plaintiff's exhibits will be referred to as
"Plaintiff Ex."

3

electronically could incur a penalty. (Plaintiff's Facts ¶ 11; oral argument.) These payments, referred to as "deposits" by the IRS, were made electronically; Hratch would request a payment from NCI's bank account to the IRS for the amount of taxes due. (Plaintiff's Facts ¶¶ 7, 9.) The EFTPS provided an instant confirmation of Hratch's request, though the payment itself would be made at a later time by the bank to the IRS. (Plaintiff's Facts ¶ 9.)

## A. NCI's Financial Troubles and its Agreement with Atlantic

By November 21, 2003, NCI was in "difficult financial straits." (Plaintiff's Facts ¶ 15.) NCI had both a bank account and a line of credit with Wachovia Bank ("Wachovia"). On November 21, 2003, Wachovia terminated NCI's line of credit and swept NCI's account of all funds, pursuant to the terms of their credit agreement. (Plaintiff's Facts ¶¶ 13, 15.) As a result, Wachovia took control of NCI's account. Thereafter, Wachovia disbursed funds for checks only for pre-approved purposes. (Plaintiff's Facts ¶ 15.)

As necessary to operate its construction business, NCI maintained surety agreements with various sureties, the primary of which was with Atlantic Mutual Companies ("Atlantic"). (Plaintiff's Facts ¶¶ 20-21.) Under these surety agreements, Atlantic provided various performance and payment bonds; Atlantic would guarantee NCI's performance and payment if NCI

were unable to do so. (Plaintiff Ex. 30, 66.) In the event NCI was unable to perform contracts for which it had obtained performance bonds from Atlantic, NCI effectively assigned its interests in all of its assets to Atlantic. (Plaintiff Ex. 30, 66.) On November 21, 2003, after returning from Wachovia, Plaintiff informed the sureties that Wachovia had terminated NCI's line of credit and swept NCI's account of its funds. (Plaintiff's Facts ¶ 21.) On November 24, 2003, the following Monday, Atlantic's representatives came to NCI's offices. Pursuant to the terms of its agreements with NCI, Atlantic effectively gained joint control over NCI's business for the time period at issue here. (Plaintiff's Facts ¶ 23.) From November 24, 2003, all NCI receipts were to be used to satisfy its obligations under its agreement with Atlantic. (Plaintiff's Facts ¶ 26.)

In December 2003,[3] NCI and Atlantic entered into a "Joint Control Trust Account Agreement" (the "Atlantic Agreement"), confirming the terms under which they had been operating since November 24, 2003. (Plaintiff's Facts ¶ 23; Plaintiff Ex. 30.) The Atlantic Agreement provided that NCI and Atlantic open a joint control trust checking account with Cardinal Bank ("Cardinal"), which NCI opened on November 21, 2003.

---

[3] The specific day of the Atlantic Agreement is left blank in the documents preamble. The notarized Power of Attorney attached to that agreement, however, is dated December 16, 2003.

(Plaintiff's Facts ¶ 26; Plaintiff Ex. 29, 30.)  Plaintiff was a
signatory on the Cardinal account, and all checks drawn on and
all charges against the Cardinal account required a signature
from both NCI and Atlantic.  (Plaintiff Ex. 29, 30.)  On
November 26, 2003, NCI made two deposits into the Cardinal
account totaling $505,256.82.  On November 28, 2003, NCI made an
additional deposit, bringing the total account balance to
$745,226.82 as of the November 30, 2006 statement.  (Plaintiff
Ex. 60.)

The Atlantic Agreement explicated which bills on the bonded
contracts would be paid.  (Plaintiff Ex. 30.)  Two provisions
specifically address the procedure for payment of payroll and
withholding and payroll taxes.  *Id.* at III.4(g)-(h).  Section
III.4(g) addressed payroll payments:

On a weekly basis, [NCI] shall provide to
representatives of [Atlantic] for approval the
payroll. . . . In the event there are sufficient
[funds] in the [Cardinal account], upon the approval
by [Atlantic] of the [payroll], [NCI and Atlantic]
shall take all steps necessary to fund the presently
existing payroll account of [NCI] from the [Cardinal
account].  It shall be the responsibility of [NCI] to
present the net [payroll] checks to its employees

6

directly rather than through the representative of
[Atlantic].

*Id.* at III.4(g). Section III.4(h) addressed payments of
withholding and payroll taxes:

Payment of all withholding and payroll taxes . . .
from the date of [the Atlantic Agreement] forward
shall be made on a priority basis directly from the
[Cardinal account] to the appropriate payee(s) for all
withholding and payroll taxes and other normal payroll
burden expenses. It shall be the responsibility of
[NCI], within the time limits of all appropriate
statutes and regulations, to prepare and present to
the representative of [Atlantic] the necessary
information to pay all such taxes and other deductions
from the [payroll], including the appropriate check(s)
from the [Cardinal account] and an envelope addressed
to the appropriate payee(s) or with an appropriate
deposit slip to the correct account to receive the
appropriate check(s). Upon receipt of the above
documentation, and to the extent there are sufficient
[funds] in the [Cardinal account], [Atlantic] shall
promptly release the check(s) from the [Cardinal
account] for the payment of such [payroll] taxes and
deductions.

*Id.* at III.4(h).

NCI ceased operations on December 31, 2003. Both it and Plaintiff entered into bankruptcy proceedings soon thereafter. (Plaintiff's Facts ¶ 55.)

## B. The Five Tax Payments at Issue

The five payroll periods at issue here are set forth in the table below.[4] (Plaintiff's Facts ¶ 37; Plaintiff's Response in Opposition at 2.) Facts specific to each of the dates are addressed in turn. As an initial matter, it is undisputed that Plaintiff learned of the tax deficiencies on December 17, 2003, after Hratch saw the letters from the IRS and informed Plaintiff of the deficiencies. (Plaintiff's Facts ¶ 37; Plaintiff's Ex. 38.)

Taxes for four payrolls within the time period at issue, due on December 17, 2003, December 24, 2003, December 31, 2003, and January 6, 2004, were timely paid, and, therefore, Plaintiff was not personally assessed for any liability with regard to them.[5]

---

[4] There appears to be some confusion between the parties as to the exact dates on which deposits were due. The table reflects the Court's understanding of the due dates as dictated by the timing set forth in 26 C.F.R. § 31.6302-1(c)(2).

[5] The process for payment of payroll and withholding taxes appears to have functioned successfully on four occasions, for deposits on and in the amount of: December 17, 2003, $34,895.41; December 24, 2003, $31,791.55; December 31, 2003, $17,302.88; and January 6, 2004, $20,919.97.

8

| Date Payroll Paid | Date Tax Payment Due | Taxes Unpaid |
|---|---|---|
| 11/19/2003 | 11/26/2003 | $41,888.40 |
| 11/26/2003 | 12/03/2003 | $43,684.49 |
| 11/30/2003 | 12/05/2003 | $22,831.51 |
| 12/03/2003 | 12/10/2003 | $23,006.24 |
| 12/31/2003 | 01/06/2004 | $9,682.74 |

## 1. The First Payment at Issue

The first payment at issue was due on November 26, 2003, for the payroll paid on November 19, 2003. (Plaintiff Ex. 69.) The amount of unpaid taxes for this payment was $41,888.40. *Id.* NCI distributed checks to employees for the first payroll on November 19, 2003. (Plaintiff's Facts ¶ 17.) In the November 21, 2003, meeting at Wachovia, Plaintiff specifically raised the issue of the first payroll, and Wachovia's representatives promised that it would fund the corresponding tax payments on this payroll. *Id.* Also on November 21, 2003, NCI received a check for $199,145.37, and deposited that amount in a then-unfunded NCI account with Southern Financial Bank ("Southern"). (Plaintiff's Facts ¶ 19.)

On November 21,[6] 2003, Hratch made an EFTPS request for Wachovia to fund the taxes due on November 26, 2003, for the first payroll, and received confirmation that the EFTPS request had been sent to Wachovia. (Plaintiff's Facts ¶ 24.) Wachovia did not fund Hratch's request. *Id.* at ¶ 31. Hratch made a second request with Wachovia, effective November 28, 2003, for payment of the first payroll taxes. (Plaintiff's Ex. 8.) NCI received hard-copy confirmation that its request with Wachovia was unfunded in a letter dated November 26, 2003, and stamped "received December 5, 2003." (Plaintiff's Facts ¶ 31; Plaintiff's Ex. 36.)

On November 24, 2003, in his meeting with representatives from Atlantic, Plaintiff informed Atlantic that representatives from Wachovia had agreed to fund the tax payment for the first payroll, and both payroll and tax payments on the second payroll, but that Atlantic would need to fund all payments thereafter. (Plaintiff's Facts ¶ 23.)

**2. The Second Payment at Issue**

The second payment at issue was due on December 3, 2003, for the payroll paid on November 26, 2003. (Plaintiff Ex. 69.) The amount of unpaid taxes for this payment was $43,684.49. *Id.*

---

[6] Plaintiff's Facts ¶ 24 states the date of Hratch's request is November 24, 2003. Plaintiff's Ex. 26, however, the hard-copy of the request confirmation, shows it was printed on November 21, 2003.

10

On November 26, 2003, Hratch made an EFTPS request for Wachovia to fund the taxes due on December 3, 2003, for the second payroll and received confirmation that the EFTPS request had been sent to Wachovia. (Plaintiff's Ex. 4.) Wachovia did not fund Hratch's request. (Plaintiff's Facts ¶ 31.) NCI received hard-copy confirmation that its request with Wachovia was unfunded in a letter dated December 4, 2003, and not stamped with a receipt date. (*Id.*; Plaintiff's Ex. 11.) NCI received this letter "sometime later" than the letter for the first payroll. (Plaintiff's Facts ¶ 31.)

On November 26, 2003, Plaintiff wrote payroll checks to employees and other creditors from NCI's Southern account. (Plaintiff's Facts ¶ 28.) These payments effectively depleted the account of the $199,145.37 deposited in it. *Id.* Hratch left for a scheduled vacation on November 29, 2003, and was away from the office until December 14, 2003. (Plaintiff's Facts ¶ 29.) Before leaving for his vacation, Hratch filed with the IRS a request to register the Cardinal account for EFTPS so that trust fund tax payments could be made through that account. (Plaintiff's Facts ¶ 27.) On December 17, 2003, NCI received confirmation from the IRS that the Cardinal account was enrolled in the EFTPS. (Plaintiff's Facts ¶ 33.)

**3. The Third Payment at Issue**

The third payment at issue was due on December 5, 2003, for the payroll paid on November 30, 2003. (Plaintiff Ex. 69.) The amount of unpaid taxes for this payment was $22,831.51. *Id*. Nothing in the record shows any EFTPS requests or any other payment attempts for these taxes until Hratch returned from vacation. (Plaintiff's Motion at 9.) Hratch states in his July 8, 2010, deposition that he showed his assistant how to make EFTPS requests, but that apparently she never tried to pay the taxes for this payroll, and an e-mail exchange between Plaintiff's son, an officer of NCI, states that NCI made no payments while Hratch was on vacation. (Hratch Dep. 153:1-22; Plaintiff's Ex. 38.) It is undisputed, however, that any funds to pay these taxes would have had to come from the Cardinal account, with approval from Atlantic. Also, nothing in the record indicates that the payroll checks to employees for the third payroll went unpaid.

**4. The Fourth Payment at Issue**

The fourth payment at issue was due on December 10, 2003, for the payroll paid on December 3, 2003. (Plaintiff Ex. 69.) The amount of unpaid taxes for this payment was $23,006.24. *Id*. Like the taxes for the third payroll, nothing in the record illustrates any payment attempts until Hratch returned from vacation, but the funds would have had to come from the Cardinal account with approval from Atlantic. Nothing in the record

12

indicates that the payroll checks to employees for the third
payroll went unpaid.

## 5. The Fifth Payment at Issue

The fifth payment at issue was due on January 6, 2004, for
the payroll paid on December 31, 2003. (Plaintiff Ex. 69.) The
amount of unpaid taxes for this payment was $9,682.74. *Id.*
Nothing in the record illustrates any payment attempts, but the
funds would have had to come from the Cardinal account with
approval from Atlantic. Nothing in the record indicates that
the payroll checks to employees for the third payroll went
unpaid. This fifth payroll payment, however, was the ninth
payroll after Wachovia terminated NCI's line of credit and swept
its bank account of funds. Prior to this ninth payment, the
fifth at issue, NCI had timely paid the payroll taxes for four
payroll periods with funds from the Cardinal account.

## II. DISCUSSION

## A. Standard of Review under Rule 56

Under Federal Rule of Civil Procedure 56, the Court must
grant summary judgment if the moving party demonstrates that
there is no genuine issue as to any material fact, and that the
moving party is entitled to judgment as a matter of law. Fed.
R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the Court views
the facts in a light most favorable to the non-moving party.

13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once
a motion for summary judgment is properly made and supported,
the opposing party has the burden of showing that a genuine
dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.*, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of
*some* alleged factual dispute between the parties will not defeat
an otherwise properly supported motion for summary judgment; the
requirement is that there be no *genuine* issue of *material* fact."
*Anderson*, 477 U.S. at 247-48. A "material fact" is a fact that
might affect the outcome of a party's case. *Id.* at 248; *JKC
Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465
(4th Cir. 2001). Whether a fact is considered to be "material"
is determined by the substantive law, and "[o]nly disputes over
facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*,
249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning
a "material" fact arises when the evidence is sufficient to
allow a reasonable jury to return a verdict in the nonmoving
party's favor. *Anderson*, 477 U.S. at 248. Rule 56(e) requires
the nonmoving party to go beyond the pleadings and by its own
affidavits, or by the depositions, answers to interrogatories,
and admissions on file, designate specific facts showing that

14

there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. ANALYSIS

The Court grants the United States' Motion for Summary Judgment because there is no issue of material fact as to whether the Plaintiff was liable under 26 U.S.C. § 6672 (2006). Federal law requires that employers withhold from their employee's paychecks their shares of the trust fund taxes. *See* 26 U.S.C. §§ 3102(a), 3402(a) (2006). The employers holds the taxes "in trust" for the United States, and must pay them to the government regularly. If an employer withholds taxes but fails to remit them, the government must credit the employees for payment, but may seek unpaid funds from the employer under § 6672.[7]

To be liable under § 6672, a person must (1) be responsible for collection and payment of trust fund taxes, and (2) willfully fail to pay them. *Plett v. United States*, 185 F.3d 216, 218 (4th Cir. 1999). The taxpayer has the burden of proof

---

[7] 26 U.S.C. 6672(a) provides that "any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

15

on both elements of § 6672 liability. *O'Connor v. United States*, 956 F.2d 48, 50 (4th Cir. 1992).

The Court holds that Plaintiff was both (1) a responsible party for the trust fund taxes, and (2) willfully failed to remit them under § 6672. Despite viewing the facts in the light most favorable to the Plaintiff, Plaintiff is liable under § 6672 because he (1) served as President of the company; (2) exercised control over the company's payroll; (3) had the ability to dictate which creditors were paid; (4) participated in the day-to-day management of the corporation; and (5) had the ability to issue checks. Plaintiff was willful because he intentionally preferred other creditors over the United States when he (1) knew of the tax deficiency, and (2) recklessly disregarded the tax deficiency. Each issue will be discussed in turn.

## A. Plaintiff's Responsibility

Plaintiff was a responsible party under § 6672 because the totality of the circumstances establishes that he has responsible person status. The Court of Appeals for the Fourth Circuit has adopted a non-exhaustive list of factors to consider when determining whether the circumstances establish responsible person status. The factors include whether the employee (1) served as an officer or director of the company; (2) controlled the company's payroll; (3) determined which creditors to pay and

when to pay them; (4) participated in the corporation's day-to-day management; (5) had the ability to hire and dismiss employees; and (6) possessed the power to write checks. *Plett*, 185 F.3d at 219. Responsible person status is not exclusive to one individual; there may be more than one responsible person, and the existence of multiple responsible persons does not alleviate one's duty. *Erwin v. United States*, 591 F.3d 313, 320 (4th Cir. 2010); *O'Connor*, 956 F.2d at 50. *See Hagen v. United States*, 485 F. Supp. 2d 622, 628 (D. Md. 2007) (a "responsible person must have significant control over the corporation's finances; however, *exclusive control* is not necessary") (emphasis in original). *See also id.* (liability under § 6672 "applies to all responsible persons, and not just *the most responsible* person") (emphasis in original).

Here, the totality of the circumstances establish that Plaintiff was a responsible party under § 6672 because five of the six enumerated factors are present. First, Plaintiff served as an officer of the company because he was the President and majority shareholder of NCI. Second, Plaintiff controlled the company's payroll because he had signature authority on NCI's account at Wachovia, Southern Financial, and Cardinal banks. Moreover, Plaintiff signed checks on these accounts in November and December 2003. Third, Plaintiff determined which creditors were to be paid because he distributed employees' payroll and

disbursed checks to other creditors. Fourth, Plaintiff
participated in day-to-day management because he actively
managed NCI, and issued checks to the necessary creditors.
Fifth, Plaintiff was able to issue checks from various NCI
accounts. Accordingly, Plaintiff meets five of the six
enumerated criteria for a responsible person under § 6682.

Plaintiff contends that he was not responsible for any of
the five tax deposits because (1) he had no authority of NCI's
accounts or finances, and (2) Wachovia promised to pay them.
The Court rejects Plaintiff's first argument because (1) NCI
made requests for Wachovia to pay after accounts were frozen,
and (2) he continued to sign checks on NCI's behalf. The Court
dismisses Plaintiff's second argument because § 6672 liability
applies to *all* responsible parties, not just *the most
responsible* party. Assuming that Wachovia promised to pay the
trust fund taxes, Plaintiff's status as a responsible party
would not be alleviated by another's duty to pay taxes.
Another's promise to pay would mean that the IRS could
potentially pursue payment from another entity, not forgive
Plaintiff for his liability.

Accordingly, the Court holds that there is no issue of
material fact as to § 6672's first prong because the totality of
the circumstances—Plaintiff's title, control of the payroll,
day-do-day management, control of personnel, and ability to

issue checks—establishes that Plaintiff was a responsible party for the purpose of trust fund tax liability.

## B. Plaintiff's Willfulness

Plaintiff was willful because he intentionally preferred to pay creditors other than the United States. The Fourth Circuit has explained that a party must intentionally, conscientiously, and voluntarily fail to pay trust fund taxes. *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992). Furthermore, a "responsible person's intentional preference for creditors other than the United States establishes willfulness as a matter of law; such an intentional preference occurs when the responsible person knows of or recklessly disregards an unpaid deficiency." *Erwin*, 591 F.3d at 326. Moreover, "when a responsible person learns that withholding taxes have gone unpaid . . . he has a duty to use all current and future unencumbered funds available to the corporation to pay those back taxes." *Erwin* 591 F.3d at 326. *See also Rizzuto v. United States*, 899 F. Supp. 2d 698, 706 (S.D.N.Y. 1995) ("[failing] to inquire about the status of the trust fund taxes after 'being put on notice that withholding tax problems exist, constitutes willful conduct.") (internal citations omitted).

It is undisputed that Newbill paid creditors other than the

United States throughout November and December. *See supra* § I.B.[8]

This being said, Newbill both intentionally preferred non-

government creditors because he both knowingly and recklessly

disregarded the nonpayment of trust fund taxes.

**i. Knowing Disregard of the Trust Fund Tax Payments**

Newbill knowingly disregarded the nonpayment of trust fund

taxes. Assuming Plaintiff did not know of any unpaid

deficiencies before December 17, 2003, he was under a duty

beyond that date to use all current and future unencumbered

funds available to the corporation to pay back the taxes.[9] *See*

*Erwin*, 591 F.3d at 326.

---

[8] (*See* Plaintiff Stmt. of Undisp. Facts ¶ 28; (Plaintiff's Reply
p. 6; Defendant Ex. 5-6.). To ensure that the facts are viewed
in the light most favorable to Plaintiff, it will be assumed
that Plaintiff did not know of the tax deficiency until December
17, 2003.

[9] There may be an issue as to whether the funds were "encumbered"
for purposes of section 6672(a) liability. Some courts have
held that "funds are encumbered only when certain legal
obligations, such as statutes, regulations, and ordinances,
impede the freedom of a company to use its funds to fulfill its
trust fund tax debts." *Bell v. United States*, 355 F.3d 387, 396
(6th Cir. 2004). "Voluntary contractual obligations, such as
[an agreement with a lender restricting a company's use of loan
proceeds], do not encumber funds so as to prevent a willful
failure to pay trust fund taxes." *Id.* Other courts "have
defined the term more broadly to encompass not only legal
obligations per se, but also 'restrictions imposed by a
creditor'—restrictions that, while perhaps not legally
enforceable, may be practically irresistible because they arise
out of the disparity of bargaining power as between the taxpayer
and its source of financing." *Purcell v. United States*, 1 F.3d

20

Here, Newbill violated the duty to use all current and future unencumbered funds because he continued to distribute payroll after December 17, 2003. (Plaintiff's Ex. 67 at 112-14.) According to the Payroll Register, NCI distributed 157 payroll checks for the time period ending December 24, 2003—a total of $114,186.05. (Plaintiff's Ex. 67 at 113.) Despite learning of the debt owed to the IRS on December 17, 2003, Newbill breached his duty by distributing money from an NCI account to non-governmental entities one week later. Had Plaintiff paid the IRS the proceeds from the 157 checks, the debt accumulated from the previous four payrolls would have been paid in its entirety. Hence, the Court holds that Newbill knowingly disregarded his duty to pay trust fund taxes by distributing payroll after December 17, 2003.

**ii. Reckless Disregard of the Trust Fund Tax Payments**

---

932, 939 (9th Cir. 1993) (setting forth an alternative standard without adopting it) (internal citations omitted).

The Court need not choose between these different standards. Even under the more permissible standard articulated in *Purcell*, NCI's funds were unencumbered pursuant to the Atlantic Agreement for purposes of trust fund tax payments. As set forth above, after receiving the necessary tax information from NCI, Atlantic was obligated by the agreement to pay the payroll withholding taxes on a priority basis. (Plaintiff Ex. 30 at III.4(h).) Plaintiff has offered no evidence that Atlantic did not abide by this provision in the agreement, nor has Plaintiff offered any evidence that after December 17, 2003, he used any NCI funds to pay the deficient taxes. The record does show, however, that NCI paid creditors other than the United States. There exists sufficient evidence that Plaintiff acted willfully because he used funds to pay creditors other than the United States after he learned of tax deficiencies.

Plaintiff intentionally preferred non-government creditors because he recklessly disregarded his duty to pay the trust fund taxes. Reckless disregard is defined as the "conscious indifference to the consequences of an act." *See Black's Law Dictionary* 506 (8th ed. 2004).

Plaintiff recklessly disregarded the known and obvious risk that the trust fund taxes would go unpaid for all five payrolls. For the first two payrolls at issue, Plaintiff acted with reckless disregard because the transaction summary did not provide for the payment of trust fund taxes. Plaintiff explained that his controller checked NCI's account online on a daily basis, and provided Plaintiff with a report of the company's transactions. As the President of NCI who had been examining the transaction summary for years, he was consciously indifferent when the statement failed to reflect the large debits associated with tax payments.

Plaintiff recklessly disregarded a known and obvious risk of tax nonpayment as to the third and fourth payrolls because he knew that electronic tax nonpayment had not been established with Cardinal Bank. Plaintiff was consciously indifferent to the need of precautionary measures were needed during Hratch's absence in a time of crisis.

Lastly, Plaintiff recklessly disregarded the tax payment as to the fifth payroll because he continued to authorize the

distribution of payroll after December 17, 2003, which is when
he became aware of the deficiency. Accordingly, Plaintiff both
knew of and recklessly disregarded his duty to pay the trust
fund taxes.

The Court has empathy for employers who recognize their
obligation to meet a payroll for their employees. It is a very
difficult choice to decide to miss a payroll at the peril of
failing to pay employee withholding taxes. That said, the
employer must live with the consequences of his business
judgment and the absolutely certain tax liability which follows.

## IV. CONCLUSION

The Court GRANTS Defendant's motion for summary judgment.
The Court holds that there is no issue of material fact as to
whether Plaintiff was responsible because the totality of the
circumstances establishes that Plaintiff was a responsible party
for the purpose of trust fund taxes. The Court further holds
that Newbill knowingly and recklessly disregarded his duty to
pay the trust fund taxes because Plaintiff exhibited an
intentional preference for non-government creditors. It is
hereby

ORDERED that Defendant's Motion for Summary Judgment is
GRANTED. Is is

23

FURTHER ORDERED that Plaintiff's Motion for Summary
Judgment is DENIED.

The Clerk is directed to enter a separate judgment pursuant
to Federal Rule of Civil Procedure 58 in favor of the United
States of America against Robert A. Newbill in the amount of
$99,566.43.  The Clerk is further directed to forward a copy of
this Order to counsel of record.

ENTERED this _29th_ day of _Novem_, 2010.

Alexandria, Virginia                              _/s/_

                                        Gerald Bruce Lee
                                        United States District Judge

24